**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| John Doe, | Case No. 9:26-cv-01358-RMG |
| Plaintiff, | |
| v. | |
| | **ORDER AND OPINION** |
| Beaufort County School District and Victoria Katherine Montgomery, | |
| Defendants. | |

Before the Court is Defendant Beaufort County School District's motion to dismiss (Dkt. No. 9). For the reasons set forth below, the motion is granted in part and denied in part.

## I.    Background

Plaintiff attended Hilton Head Island High School ("Hilton Head"); a secondary school governed by Beaufort County School District (the "District"). (Dkt. No. 1). Defendant Victoria Katherine Montgomery was employed as a teacher at Hilton Head. *Id*. At all pertinent times, the District received federal funds. *Id*.

The Court is obligated at the motion-to-dismiss stage to treat all plausible allegations in the complaint as true, and all inferences must be read in a light most favorable to Plaintiff as the nonmoving party. The Complaint alleges the following. Prior to beginning her employment with the District, Montgomery "had a known previous relationship with a former student of hers following her service as a . . . teacher in Indiana which resulted in her having a child out of wedlock with [that] former student." *Id*. at ¶ 31. While at Hilton Head, her "propensity to engage in inappropriate and illegal sexual conduct with students who are much younger than her" resulted in an "inappropriate, illicit, and illegal sexual relationship" with Plaintiff during his time at Hilton

1

Head. *Id*. at ¶¶ 16, 31. In particular, Montgomery would invite Plaintiff into a private room on school property, at which times she would inappropriately touch him. *Id*. at ¶ 57. She would also send Plaintiff private text messages and social media posts, violating the District's policy against teachers "using their mobile electronic devices to send private text messages to school students" and "befriending school students on social media or otherwise using social media platforms to pursue inappropriate private relationships with public school students." *Id*. at ¶¶ 25-26.

Troubled by Montgomery's behavior, "multiple parents of other high school students . . . reported and complained to [the] District about a suspected illegal sexual relationship between Plaintiff and . . . Montgomery." *Id*. at ¶ 21. The District, however, did nothing to "intervene and address or end this concerning behavior." *Id*. The District also received reports from parents of other students that Montgomery had engaged in "potentially harmful sexual grooming behaviors . . . against students at Hilton Head . . . , and [the District] failed to adequately intervene and provide protection to its students from these behaviors." *Id*. at ¶ 22.

Rather than take preventive measures, the District allowed Montgomery to teach a class during Plaintiff's senior year "wherein Plaintiff was the only student in the class," despite the complaints regarding her misconduct. *Id*. at ¶ 24. This arrangement allowed Montgomery to continue to pursue a sexual relationship with Plaintiff, and her efforts ultimately resulted in her having sexual intercourse with him. *Id*. at ¶¶ 23, 24. When the District discovered Montgomery's sexual misconduct, her employment was terminated, and she was criminally prosecuted for sexual battery with a student. *Id*. at ¶ 58.

After Montgomery was dismissed by the District, the effects of her harassment were "enhanced and worsened" by representatives of the District who made "discriminatory remarks to [Plaintiff]." *Id*. They "suggest[ed] that [he] should not feel as though he had been harmed at the

2

hands of his teacher because he is a male rather than a female" and "because the sexual battery he endured was of a heterosexual nature rather than homosexual." *Id*.

Because of the acts, omissions, and conduct of Defendants, "Plaintiff had difficulty focusing on his work while in school which adversely impacted his access to an education equal to his peers." *Id*. at ¶ 34. He suffered "emotional distress, mental anguish, mental anxiety, mental suffering, embarrassment, loss of educational opportunities, humiliation, trauma, loss of enjoyment of life, and other harms." *Id*. at ¶ 38. Moreover, "Plaintiff experienced severe emotional distress that has required extensive counseling and therapy, and [he] was unable to function normally at his planned college destination such that he had to withdraw from college and interrupt his normal academic and social progression." *Id*. at ¶ 35.

Accordingly, Plaintiff brought this action asserting federal and state law claims against both Defendants, including: (1) violation of Plaintiff's substantive due process rights under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983; (2) hostile educational environment in violation of Title IX pursuant to 20 U.S.C. § 1681(a);[1] (3) gross negligence; (4) intentional infliction of emotional distress ("IIED") and outrage; (5) negligence per se; and (6) attorney's fees.[2] *See generally* (Dkt. No. 1).

---

[1] Although Plaintiff pleads intentional discrimination and deliberate indifference as separate causes of action, *see* (Dkt. No. 1), those allegations are more properly understood as elements of a Title IX sexual-harassment claim rather than independent claims. Accordingly, the Court addresses them together as a single Title IX cause of action.

[2] A request for attorney's fees is not a separate cause of action. *See Turner v. Thomas*, 313 F. Supp. 3d 704, 717 n.9 (W.D. Va. 2018) (citation omitted). Therefore, to the extent Plaintiff asserts it as a claim, it is dismissed.

On April 24, 2026, the District filed a motion to dismiss the claims against it for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 9). Plaintiff responded in opposition on May 22, 2026, (Dkt. No. 13), and the District replied on May 29, 2026 (Dkt. No. 14). This matter is now ripe for review.

## II.     Legal Standard

A Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (citation omitted). *See also Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) . . . does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.") (citation and punctuation omitted). To be legally sufficient, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A Rule 12(b)(6) motion "should not be granted unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). When considering a Rule 12(b)(6) motion, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Id*. (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted).

4

### III.    Discussion

#### A.  Section 1983 Claim

The Complaint alleges that the District violated Plaintiff's Fourteenth Amendment rights by "failing to act in a necessary and reasonable manner to prevent him from becoming the victim of sexual grooming, and of sexual harassment, and to prevent the sexual battery from occurring." (Dkt. No. 1 at ¶ 42).

The District argues that Plaintiff fails to sufficiently allege that there was an official policy or custom that resulted in his alleged constitutional harm. (Dkt. No. 9-1 at 3-6). It contends that, beyond mere conclusory allegations, the Complaint does not specifically state what notice it had of Montgomery's sexual misconduct; namely, although he claims other parents reported Montgomery's behavior to the District, Plaintiff "never states how many complaints or reports were made to [the District], nor does he mention what specific acts occurred that would support such . . . reports/complaints." *Id*. at 5. Finally, the District posits that, even if it had notice, it did not act with deliberate indifference because it dismissed Montgomery upon learning of her misconduct. *Id*. at 5-6.

In response, Plaintiff avers that the Complaint sufficiently alleges "a plausible pattern in which District officials had actual or constructive knowledge of the very misconduct now at issue." (Dkt. No. 13 at 11). That is, the District received complaints from other parents about the inappropriate relationship between Plaintiff and Montgomery and her alleged sexual grooming of other students, her private cell phone communications with Plaintiff, and her prior history of having a sexual relationship with a former student. *Id*. Plaintiff further argues that, at this stage of the proceedings, it is not necessary to state with specificity the names of parents who submitted complaints—information which is exclusive possession of the District and only available through

5

discovery. *Id*. at 12. Lastly, Plaintiff claims that it is immaterial that the District dismissed Montgomery after learning of her conduct, because "[d]eliberate indifference is measured by what the institution did with the knowledge it had before and during the harassment—when intervention could still have prevented harm—not by belated post-discovery cleanup." *Id*. at 13.

Section 1983 provides that any "person" who under color of state law causes the deprivation of another's federal constitutional rights is liable to the injured party. 42 U.S.C. § 1983. In *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690 (1978), the Supreme Court held that municipalities qualify as "persons" under Section 1983. Municipalities, however, may only be held liable for their own unlawful acts; they are not vicariously liable for constitutional violations caused by their employees. *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014) (citation omitted). A plaintiff must demonstrate a "direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). Thus, municipal liability arises only when the alleged constitutional injury results from an official policy, custom, or practice attributable to the municipality itself. *Id.* at 403-04 (citation omitted).

> Municipal liability under *Monell* can arise in four ways:
>
> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (citation and punctuation omitted). The Complaint appears to allege liability by way of the third avenue. *See* (Dkt. No. 1 at ¶ 42) ("Defendants violated Plaintiff's constitutional rights by failing to act in a necessary and reasonable manner to prevent him from becoming the victim of sexual grooming, and of sexual

6

harassment, and to prevent the sexual battery from occurring, and these failures deprived Plaintiff of his rights to personal freedom and protection, and these failures resulted in the injuries and damages sustained by Plaintiff.").

To succeed on this theory, a plaintiff must satisfy the "demanding standard" of deliberate indifference. *Mullen v. Town of Sunset Beach, N.C.*, 175 F.4th 466, 472 (4th Cir. 2026) (citation omitted). At this stage of the proceedings, deliberate indifference requires alleging facts showing that municipal policymakers "(1) knew or should have known that their failure to act was likely to result in constitutional injury, and (2) disregarded that risk." *Id*. (citation omitted). "Isolated instances of unconstitutional conduct by municipal employees are insufficient to establish municipal liability." *Id*. at 472-73 (citation omitted). "Instead, a plaintiff generally must demonstrate a pattern of 'persistent and widespread' similar constitutional violations sufficient to place policymakers on notice that their failure to adopt appropriate policies or training would likely result in constitutional injury." *Id*. at 473 (quoting *Owens*, 767 F.3d at 402-03). "That means proof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom." *Johnson v. Baltimore City, Md.*, 163 F.4th 808, 822 (4th Cir. 2026) (citation and punctuation omitted).

Here, the Complaint fails to allege sufficient facts showing that the District knew or should have known of a substantial risk that its failure to take preventive action would likely result in inappropriate relationships between its teachers and students.

Taken as true, the Complaint alleges that the District received reports that Montgomery was involved in a "suspected illegal sexual relationship" with Plaintiff and was engaged in "potentially harmful sexual grooming behaviors . . . against students at Hilton Head." (Dkt. No. 1 at ¶¶ 21, 22). Further, prior to her employment with the District, Montgomery had a sexual

7

relationship with a former student and the District knew or should have known that she was privately messaging Plaintiff. *Id*. at ¶¶ 26, 31. Critically, these allegations which purportedly show notice relate to Montgomery alone. Plaintiff does not allege any comparable incidents involving other District employees, complaints concerning other teachers at Hilton Head, or any other facts suggesting a widespread practice of teacher-student sexual misconduct within the District. *See Mullen*, 175 F.4th at 473 (noting that the plaintiff failed to prove that the defendant had the "notice necessary to establish its deliberate indifference to the protection of citizens' constitutional rights" where there was no evidence of a "pattern of prior *similar* constitutional violations") (emphasis supplied). *See also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821 (1985) (plurality opinion) (articulating that overly tolerant concepts of policy and causation would impose municipal liability "simply because the municipality hired one 'bad apple'"). In other words, there is a dearth of any allegations in the Complaint that support the conclusion that the conduct charged as to Montgomery was part of a well-known course of conduct by District employees. *See Milligan v. City of Newport News*, 743 F.2d 227, 230 (4th Cir. 1984). As such, because the Complaint focuses entirely on the conduct of one teacher, Plaintiff fails to state a plausible claim that the District had notice of a widespread and persistent practice of similar constitutional violations by District employees, as required to impose municipal liability under *Monell*. A comparison with *Owens v. Baltimore City State's Attorney's Office* shows why.

In *Owens*, the plaintiff alleged that "reported and unreported cases from the period of time before and during the events complained of" and "a number of motions . . . filed and granted during this time period . . . demonstrate that [the defendant] maintained a custom, policy, or practice to allow this type of behavior either directly or . . . by condoning it, and/or knowingly turning a blind eye to it." 767 F.3d at 403 (punctuation omitted). The Fourth Circuit determined that "the

8

assertions as to 'reported and unreported cases' and numerous 'successful motions' are factual allegations, the veracity of which could plausibly support a *Monell* claim." *Id.* But, the Court also recognized "that courts have dismissed *Monell* claims when the plaintiff has alleged nothing more than a municipality's adherence to an impermissible custom." *Id.* It reasoned that the plaintiff in *Owens* had "done more than that: [the plaintiff] has alleged facts—the existence of 'reported and unreported cases' and numerous 'successful motions.'" *Id.*

In contrast, here, Plaintiff does not allege any similar incidents or cases of other teachers sexually harassing students in the District. Thus, the Complaint fails to sufficiently demonstrate that the District was on notice that its current policies failed to protect its students from sexual harassment and that preventive measures needed to be implemented to avoid the kind of constitutional violation suffered by Plaintiff. Concluding otherwise would be finding the District liable based entirely on Montgomery's conduct, as opposed to its *own* illegal acts. *See Monell*, 436 U.S. at 691 (stating that a municipality "cannot be held liable *solely* because it employs a tortfeasor") (emphasis in original). Thus, Plaintiff fails to state a claim for municipal liability under § 1983.

**B. Title IX Claim**

In his second and third causes of action against the District, Plaintiff asserts a hostile education environment claim under Title IX, 20 U.S.C. § 1681. *See generally* (Dkt. No. 1).

Title IX states in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Courts have looked to case law for Title VII of the Civil Rights Act of 1964 which addresses sexual discrimination in the workplace, *see* 42 U.S.C. § 2000e–2(a)(1) (2004), to establish what

9

constitutes discrimination based on sex under Title IX. *See Jennings v. Univ. of N.C.,* 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.") (citation omitted). Sexual harassment is recognized by Title VII and is therefore considered a form of discrimination under Title IX, including "hostile environment" sexual harassment as alleged in this case. *See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66 (1986) (Title VII action for hostile environmental sexual harassment).

> The Fourth Circuit has stated that:
>
> To establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that (1) [he] was a student at an educational institution receiving federal funds, (2) [he] was subjected to harassment based on h[is] sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution.

*Jennings*, 482 F.3d at 695 (citation omitted). The District contends that Plaintiff fails to sufficiently allege that his harassment was based on his sex; that, even if Montgomery's conduct was sufficiently severe or pervasive, it created a hostile or abusive environment at Hilton Head; and that there is a basis for imputing liability to the District. (Dkt. No. 9-1 at 6-9).

      1. *On the Basis of Sex.*

The District summarily argues that the Complaint fails to allege "[Plaintiff] was intentionally discriminated on the basis of his sex." *Id*. at 6. In response, Plaintiff contends that "sexual harassment of a student by a teacher is, in itself, discrimination on the basis of sex." (Dkt. No. 13 at 14). According to Plaintiff, he is not required to plead facts showing similarly situated individuals were not sexually harassed by Montgomery, nor must he allege disparate treatment between male and female students. *Id*. at 14.

10

To satisfy this element, Plaintiff must allege facts that show that Montgomery subjected him to harassment based on his sex. *See* 20 U.S.C. § 1681(a). This requirement distinguishes sex-based discrimination from otherwise boorish behavior, the former of which is the concern of Title IX. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (noting that "simple teasing [and] offhand comments" do not amount to sexual harassment) (citation and punctuation omitted). Harassment is based on sex when, but-for the individual's sex, the offending conduct would have not occurred. *Webster v. Chesterfield Cnty. Sch. Bd.*, 38 F.4th 404, 410 (4th Cir. 2022) (citation omitted).

A plaintiff may satisfy this standard in one of several ways. "[He] may, for example, [allege] that [he] was subjected to sexual advances or propositions." *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 717 (4th Cir. 2024) (citation and punctuation omitted). The Supreme Court has noted that "[c]ourts and juries have found the inference of discrimination easy to draw in most [heterosexual] sexual harassment situations, because the challenged conduct typically involves explicit or implicit proposals of sexual activity . . . ." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). Alternatively, discrimination because of sex can be gleaned from "sex-specific language that is aimed to humiliate, ridicule, or intimidate." *Jennings*, 482 F.3d at 695 (citation omitted).

Here, Plaintiff has sufficiently alleged facts, taken as true, to show that Montgomery sexually harassed him because he is a male. The Complaint posits that Montgomery "insist[ed]" that Plaintiff engage in sexual intercourse with her. (Dkt. No. 1 at ¶ 23). She also sexually groomed Plaintiff through repeated acts of inappropriate "sexual touching," "invit[ed] him to visit her . . . in a private room on school grounds" to further encourage a sexual relationship, and "sen[t] [him] private text message and social media platform posts" in order to "commit illegal acts of sexual

11

battery against Plaintiff . . . ." *Id*. at ¶¶ 26, 57. Viewed in the light most favorable to Plaintiff, these allegations indicate that Montgomery's harassment was of an extremely sexual nature. She made sexual propositions, touched Plaintiff in a sexual manner, and ultimately coerced him into engaging in sexual intercourse with her. *See Oncale*, 523 U.S. at 80; *Jennings*, 482 F.3d at 695-96 (finding that the plaintiff presented sufficient evidence that her soccer coach discriminated against her on the basis of sex because the coach's comments were sexual in nature and focused on the bodies of the plaintiff and her teammates). Therefore, Plaintiff has alleged sufficient facts to show that Montgomery's harassment was "based on sex."

### 2. *Severe or Pervasive*.

Although the District does not challenge whether Montgomery's conduct was severe or pervasive, the Court nevertheless considers that issue because it informs the Court's analysis of whether the alleged conduct was sufficient to create a hostile educational environment.

"Harassment reaches the sufficiently severe or pervasive level when it creates an environment that a reasonable person would find hostile or abusive and that the victim [himself] subjectively perceives to be abusive." *Jennings*, 482 F.3d at 696 (citation and punctuation omitted). "Whether gender-oriented harassment amounts to actionable (severe or pervasive) discrimination depends on a constellation of surrounding circumstances, expectations, and relationships." *Id*. (citation and punctuation omitted). A court must examine all circumstances, including "the positions and ages of the harasser and victim, whether the harassment was frequent, severe, humiliating, or physically threatening, and whether it effectively deprived the victim of educational opportunities or benefits." *Id*. (citation omitted). "Evidence of a general atmosphere of hostility toward those of the plaintiff's gender is considered in the examination of all the circumstances." *Id*. (citation omitted). "Simple teasing, offhand comments, and isolated incidents

(unless extremely serious) will not amount to discrimination." *Id*. (citation and punctuation omitted). "Common sense, and an appropriate sensitivity to social context, will enable courts and juries to identify objectively hostile or abusive conduct." *Id*. (citation and punctuation omitted).

Montgomery's conduct as alleged is sufficiently severe or pervasive to support a Title IX claim. Beginning with age disparity, Plaintiff was a high school student—meaning he was certainly a teenager—who was coerced into engaging in a sexual relationship with an adult. *See* (Dkt. No. 1 at ¶¶ 17, 23, 31); *Jennings*, 482 F.3d at 697 (finding that age disparity of 45-year-old coach and teenage plaintiff was relevant to finding that there was a hostile or abusive sexual environment). More significant than her seniority, however, is the fact that Montgomery was in a position of power over Plaintiff's education, and thus his future. As alleged, Montgomery was Plaintiff's teacher in a class wherein he was the only student during his all-important senior year of high school. (Dkt. No. 1 at ¶ 24). Accordingly, it is reasonable to infer that if Plaintiff rejected Montgomery's sexual advances or disclosed her improper conduct to school administrators, she may have retaliated by punishing Plaintiff academically. *See Jennings*, 482 F.3d at 697 ("The disparity in power between Dorrance and his players trapped players into responding to his questions and enduring the [hostile] environment."). Montgomery's role as Plaintiff's teacher further allowed her to "mingle with [him] in private while on school grounds" and engage in "inappropriate acts of sexual touching." (Dkt. No. 1 at ¶¶ 24, 57). *See Okoli v. City of Baltimore*, 648 F.3d 216, 221 (4th Cir. 2011) (holding that, in Title VII context, propositions for sex and physical touching weigh heavily in favor of finding that the harassment was severe or pervasive). Therefore, viewing these allegations as true, Plaintiff has plausibly alleged that Montgomery's conduct was sufficiently severe and pervasive to support a Title IX claim.

3. *Hostile or Abusive Environment.*

The District argues that Plaintiff fails to plead that Montgomery's harassment created a hostile environment because he does not claim that he was deprived of any educational opportunities as a result of her harassment. (Dkt. No. 9-1 at 6). Specifically, it contends that Plaintiff does not allege "he was unable to finish high school, further attend class at [Hilton Head], or remain a student at [Hilton Head]." *Id.* at 6-7. Plaintiff asserts that whether he was unable to finish schooling at Hilton Head is irrelevant because that fact has no bearing on the ultimate issue of whether the harassment deprived him of equal access to the educational opportunities or benefits provided by the school. (Dkt. No. 13 at 16-17). Under the proper inquiry, Plaintiff argues that the Complaint sufficiently alleges the harassment resulted in a denial of equal access to educational opportunities because Plaintiff had difficulty focusing in school, adversely affecting his education; suffered severe emotional distress requiring extensive counseling and therapy; and was unable to function at his planned college destination, forcing him to withdraw and interrupt his academic and social progression. *Id.* at 16-17. Plaintiff contends that these allegations show that "the harassment [had] a meaningful adverse effect on [his] educational experience." *Id.* at 17.

In proving actionable discrimination in a Title IX claim, "a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 651 (1999) (citation omitted). Further, "[t]he relationship between the harasser and the victim necessarily affects the extent to which the misconduct can be said to breach Title IX's guarantee of equal access to educational benefits and to have a systemic effect on a program or activity." *Id.* at 653. The Fourth Circuit explained in *Jennings* that, based

14

on the Supreme Court's holding in *Davis*, a victim's sexual harassment can be said to have denied the victim equal access to educational opportunities or benefits when, among other things, the harassment "has a concrete, negative effect on the victim's ability to participate in an educational program or activity." *Jennings*, 482 F.3d at 699 (citation and punctuation omitted).

In *Jennings*, the Fourth Circuit found that the plaintiff had provided sufficient evidence to show that her coach's sexual harassment had a concrete, negative effect on her ability to participate in the soccer program. *Id*. The court noted that the plaintiff satisfied the *Davis* standard because she was not merely subjected to one encounter of sexual comments by the soccer coach, but that the coach had created an "atmosphere" under which the plaintiff and others on the team "had to endure sexual harassment in order to play." *Id.* at 699-700. The plaintiff testified that the hostile atmosphere created by her soccer coach's constant discussion of the players' personal sex lives made her feel "humiliated, anxious, and uncomfortable," which negatively affected her performance on the soccer team and in the classroom. *Id.* at 699. Thus, the court found that the coach's conduct and the direct targeting of the plaintiff created a hostile environment that led to a drop in the plaintiff's academic and athletic performance, thereby having a concrete, negative effect on her ability to participate in an educational program or activity. *Id.* at 700.

Here, the Court finds that Plaintiff has alleged sufficient facts to show that Montgomery's harassment negatively affected his ability to participate in an educational program or activity. To begin, Montgomery routinely violated school policies by privately messaging Plaintiff by cell phone, expressing her desire to engage in sexual intercourse with him. (Dkt. No. 1 at ¶¶ 25-26). Plaintiff alleges that he was subjected to ongoing harassment while matriculating at Hilton Head and that, because he was the only student enrolled in one of Montgomery's classes, he was frequently isolated with her. *Id*. at ¶¶ 23-24, 57. As his teacher, Montgomery "further prey[ed]"

15

on Plaintiff, fostered her desired sexual relationship with him, and touched him inappropriately. *Id*. at ¶ 24. Thus, like the plaintiff in *Jennings*, Plaintiff was required to have continued contact with Montgomery and was subject to her supervision during his time at Hilton Head.

Because of the harassment, Plaintiff was unable to focus on his schoolwork, required mental health treatment because of severe emotional distress, suffered "humiliation" and "trauma," and had to withdraw from college and "interrupt his normal academic and social progression" because he could not function. *Id*. at ¶¶ 34, 35, 38. *See Jennings*, 482 F.3d at 700 (finding it relevant that, because of the soccer coach's sexual comments, the plaintiff lived in fear and felt humiliated). The Complaint further contends that Montgomery's sexual harassment went beyond Plaintiff, as it alleges that there were reports that Montgomery had exhibited sexually grooming behavior towards other students at Hilton Head. (Dkt. No. 1 at ¶ 22). *See Jennings*, 482 F.3d at 698 (noting that the soccer coach directed his explicit comments towards other players on the team, causing them to feel "uncomfortable," "bothered," and "humiliate[ed]"). Accordingly, the Court finds that the Complaint plausibly alleges that the total impact of Montgomery's severe and pervasive harassment, including the severe emotional distress it caused Plaintiff to suffer, had a concrete, negative effect on his ability to participate in school.

As to the District's argument that Plaintiff fails to allege that he was denied the opportunity of finishing school, the Court finds this contention unpersuasive. In *Jennings*, the Fourth Circuit found it immaterial that the plaintiff's grades had improved during the time she was subjected to her soccer coach's harassment, concluding that this "evidence does not prevent [the plaintiff] from establishing that she has a triable issue on the last part of the hostile environment element of her Title IX claim." *Id*. at 699-700. The court stated that, "[i]f anything, it shows how hard [the plaintiff] was trying, and what she believed she was achieving, in spite of the hostile environment."

16

*Id*. at 700. In sum, the court found that, notwithstanding any improvements at school, the coach's harassment "negatively affect[ed] . . . her ability to participate in the soccer program." *Id*. at 699.

The same reasoning applies here. The fact that Plaintiff does not allege the harassment prevented him from completing his education at Hilton Head does not compel the conclusion that he was not deprived of educational opportunities or benefits. A student's ability to persevere despite harassment does not negate the adverse effects of that harassment on his participation in school programs and activities. As alleged, Montgomery's harassment was so severe that Plaintiff struggled to focus in class, became depressed, required therapy, and later withdrew from college. Accordingly, the mere fact that Plaintiff completed his education at Hilton Head does not foreclose a finding that Montgomery's harassment impeded his ability to participate in and benefit from the school's educational programs. Indeed, subscribing to the District's argument would require the Court to apply an overly rigid analysis that overlooks the reality that victims of sexual harassment may experience and respond to harassment in different ways. Therefore, the District's assertion fails.

### 4. *Institutional Liability*.

The District offers several reasons for why the Complaint fails to establish a basis for liability to it. First, it argues that Plaintiff does not allege that any particular school official with authority to address harassment had actual or constructive knowledge of Montgomery's conduct. (Dkt. No. 9-1 at 8; Dkt. No. 14 at 5). Second, it claims that because the Complaint alleges parents of other students—as opposed to Plaintiff's own parents—notified the District about Montgomery's behavior, he fails to properly allege that the District had the type of notice necessary to establish Title IX liability. (Dkt. No. 9-1 at 8). Next, the District asserts that the Complaint only makes conclusory allegations that school officials had actual notice of Montgomery's sexual

harassment, but that, even if there was actual notice, the Complaint's own allegations concede that the District was not deliberately indifferent. *Id*. at 8-9. In support of this claim, the District relies on Plaintiff's allegation that "[e]ven after the sexual misconduct of Defendant Montgomery was discovered and she was dismissed by Defendant School District from her employment position with Hilton Head High School . . . ." *Id*. at 9 (citing (Dkt. No. 1 at ¶ 58)) "This statement," the District contends, "negate[s] any allegation of deliberate indifference because it shows that [the District] took appropriate action by terminating [Montgomery's] employment at the school." *Id*.

In response, Plaintiff argues that the Complaint alleges that the District received actual notice in the form of multiple reports from parents of other students at Hilton Head about a "suspected illegal sexual relationship between Plaintiff and . . . Montgomery"; multiple reports about Montgomery sexually grooming other students at Hilton Head; Montgomery's prior history of a relationship with a former student; Montgomery's repeated communications with Plaintiff over text message and social media; and learning Montgomery and Plaintiff were having sexual intercourse, "which is a discovery that necessarily presupposes pre-termination knowledge." (Dkt. No. 13 at 18).

He further argues that actual notice does not require that the parents of an alleged victim make a report or complain about the harassment; rather, he claims the question is whether the reports the District received (regardless of who submitted them) could objectively be construed as reports of sexual harassment. *Id*. at 18-19. Lastly, Plaintiff posits that the Complaint alleges that the District acted with deliberate indifference when it received multiple reports of Montgomery's sexual harassment of Plaintiff and others, but failed to take any action, and instead further facilitated the abuse by placing Plaintiff in a one-on-one class with Montgomery. *Id*. at 19.

An institution can be held liable for a Title IX violation only if "an official who has authority to address the alleged discrimination and to institute corrective measures has actual knowledge of discrimination in the institution's programs and fails adequately to respond or displays deliberate indifference to discrimination." *Jennings*, 482 F.3d at 700 (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)) (punctuation omitted). "Such an official has actual notice where he receives a report that can objectively be construed as alleging sexual harassment." *Doe v. N.C. State Univ.*, 125 F.4th 498, 503 (4th Cir. 2025) (citation and punctuation omitted).

a. *Appropriate Official*.

Turning first to whether an "appropriate official" had notice of Montgomery's sexual harassment, the District correctly observes that the Complaint does not identify a specific official with authority to address Montgomery's conduct who had actual knowledge of her alleged grooming and inappropriate sexual relationship with Plaintiff. That argument, however, elevates form over substance. Here, the Complaint alleges that multiple parents reported Montgomery's predatory conduct to the District. (Dkt. No. 1 at ¶¶ 21-22). Given the seriousness of such allegations, the Court may reasonably infer that the reports were made to, or reached, officials with supervisory authority at Hilton Head or within the District. Furthermore, at the pleading stage, the Court need not determine precisely which official received the reports, as whether a particular individual qualifies as an "appropriate person" under Title IX is a fact-intensive inquiry. *See Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1256 (11th Cir. 2010) (citation omitted). Accordingly, the Court finds it plausible that the reports were received by an "appropriate person" or were communicated to one, thereby satisfying this element of the actual-notice requirement.

b. *Actual Notice.*

The Court thus turns to whether the Complaint sufficiently alleges facts that constitute actual notice to the District of Montgomery's harassing behavior. On this point, the Fourth Circuit's decision in *Doe v. North Carolina State University* is instructive. There, the court explained that "[a]ctual notice requires that the school be aware of an allegation that an employee is *currently* sexually harassing a student." 125 F.4th at 507 (citation and punctuation omitted). "Currently means when an allegation of sexual harassment is made . . . at the time of the plaintiff's harassment." *Id*. (citation and punctuation omitted). With this in mind, the Fourth Circuit considered, among other things, the allegation that the defendants received a report in 2016 that a university sports official was grooming male student athletes. *Id*. at 502. The court found that, "[d]rawing all reasonable inferences in Doe's favor, a reasonable official would construe [the] report of 'sexual grooming' as alleging sexual harassment." *Id*. at 506 (citation and punctuation omitted).

On this same reasoning, the Court is persuaded that Plaintiff plausibly alleges that the District had actual notice of Montgomery's misconduct. Here, the District allegedly knew that, prior to her employment, Montgomery had been involved in a sexual relationship with a former student that resulted in the birth of a child. (Dkt. No. 1 at ¶ 31). Even assuming the relationship began only after the student had reached the age of majority and was no longer enrolled in school, it is reasonable to infer that the District was aware of conduct raising concerns about Montgomery's ability to maintain appropriate professional boundaries with students. Even more significant, the District was notified by multiple parents that Montgomery was sexually grooming students at Hilton Head and was suspected of having an inappropriate sexual relationship with Plaintiff. *Id*. at ¶¶ 21-22. *See Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 269 (4th Cir. 2021)

(finding that the school district had actual notice that a teacher had been sexually harassing the plaintiff, in part, because "[s]chool officials . . . received reports from other members of the school community explicitly alleging that [the plaintiff's teacher] had sexually harassed [the plaintiff]"). Accordingly, the Court finds that prior notice of sexual involvement with students and reports of grooming and inappropriately engaging with students "can objectively be construed as alleging sexual harassment" and that, at the pleading stage, allegations that such information was conveyed to an appropriate official is sufficient to plausibly plead that an institution had actual notice of sexual harassment. *Id.* at 265.[3]

Contrarily, the District erroneously contends that *Gebser* stands for the proposition that there is no actual notice for Title IX liability where complaints of sexual harassment come from parents of other students, as opposed to the parent of the child alleging they were sexually harassed. In *Gebser*, the Court held that the defendant school district did not have actual notice that the plaintiff was subjected to sexual harassment by her teacher. 524 U.S. at 291. The facts there showed that the only information the "appropriate official" had concerning the teacher's misconduct was "from parents of other students charging only that [the teacher] had made inappropriate comments during class . . . ." Critically, the Court found that this information was "plainly insufficient" not because it came from other parents, but because it did not "alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student." Therefore, as Plaintiff correctly notes, the question is whether the information provided to an

---

[3] Although these allegations may be sufficient to support actual notice for purposes of Title IX, they do not establish the pattern of similar constitutional violations necessary to impose municipal liability under *Monell*, as concluded above.

institution, notwithstanding who makes the report, can "objectively be construed as alleging sexual harassment." *Fairfax Cnty.*, 1 F.4th at 265. Accordingly, the District's argument that Plaintiff fails to plausibly allege actual notice because Plaintiff's parents did not report Montgomery's misconduct does not comport with the law, and thus this contention does not warrant dismissal of Plaintiff's Title IX claim.

c.   *Deliberate Indifference.*

As to whether the District was deliberately indifferent, the Complaint must plead facts that demonstrate that the school's "response to the alleged harassment or the lack of any such response is clearly unreasonable in light of the known circumstances." *Fairfax Cnty.*, 1 F.4th at 271 (citation and punctuation omitted). Relying on *Davis*, the Fourth Circuit has articulated that "an educational institution could be liable under Title IX not only where its deliberate indifference causes students to undergo harassment, but also where such indifference makes them liable or vulnerable to harassment." *Id*. at 273 (citing *Davis*, 526 U.S. at 645) (punctuation omitted). In *Fairfax County*, the court held that

> a school may be held liable under Title IX if its response to a single incident of severe sexual harassment, or the lack thereof, was clearly unreasonable and thereby made the plaintiff more vulnerable to future harassment or further contributed to the deprivation of the plaintiff's access to educational opportunities.

*Id*. at 274.

"While deliberate indifference is a high standard that requires more than a showing of mere negligence, . . . half-hearted investigation or remedial action will not suffice to shield a school from liability." *Id*. at 271 (citation and punctuation omitted). However, "[i]f a school becomes aware of an unsubstantiated allegation of sexual harassment, duly investigates it, and reasonably

22

dismisses it for lack of evidence, the school would not be liable since it did not act with deliberate indifference." *Id.* at 268.

Here, Plaintiff alleges that, upon receiving actual notice of Montgomery's prior history of sexual misconduct with students and reports of sexual misconduct towards Plaintiff and other Hilton Head students, the District did not "intervene and address or end this concerning behavior noticed and complained of by multiple parents" and "failed to adequately intervene and provide protection to its students from these behaviors." (Dkt. No. 1 at ¶¶ 21-22). Rather, the District effectively dismissed these reports and "allow[ed] [Montgomery] to teach a class during Plaintiff's senior year of high school wherein Plaintiff was the only student in the class," enabling her to continue to sexually harass Plaintiff. *Id.* at ¶ 24. *See Jennings*, 482 F.3d at 700 (finding that the defendant acted deliberately indifferent where, after being informed of the soccer coach's sexual harassment, it "dismissed [her] complaint" and told her "that she should work out her problems directly with him," allowing the harassment to continue). Viewed in the light most favorable to Plaintiff, these allegations demonstrate that the District became aware that one of its teachers was sexually harassing a student and, instead of preventing further harassment, placed the student in more danger by allowing him to be isolated with his harasser. Such a response is wholly unreasonable. As such, Plaintiff plausibly alleges deliberate indifference, as the District failed to take appropriate corrective action despite notice of the risk, leaving Plaintiff more vulnerable to harassment and the resulting deprivation of access to educational opportunities. *See Jennings*, 482 F.3d at 700-01.

The District's contention that the Complaint concedes that corrective action was taken upon learning of Montgomery's sexual harassment is of no moment. The District appears to interpret the Complaint to allege that it terminated Montgomery after discovering her "sexual

23

misconduct," and it further assumes that this phrase encompasses the reports from other parents regarding Montgomery's grooming behavior and suspected relationship with Plaintiff. From that premise, the District argues that the Complaint necessarily forecloses a finding of deliberate indifference because it alleges that Montgomery was terminated once the District learned of the misconduct.

The Court cannot adopt the District's interpretation at this stage because the Complaint does not clearly allege that the District terminated Montgomery upon receiving the parental reports or notice of her prior sexual relationship with a student. Instead, construing the allegations in the light most favorable to Plaintiff, the Complaint reasonably supports the inference that the District acted only after discovering Montgomery had sexual intercourse with Plaintiff, despite having already received notice of her prior misconduct and the concerns raised by parents. The Court must therefore accept that inference for purposes of the present motion to dismiss. *See Mylan Lab'ys*, 7 F.3d at 1134.

The Court will therefore deny the motion to dismiss to the extent it seeks dismissal of Plaintiff's Title IX claim.

### C. Gross Negligence

Plaintiff alleges that the District was grossly negligent in several ways: (1) failing to properly supervise and protect students; (2) failing to supervise, manage, and train its employees; (3) "[f]ailing to protect Plaintiff from an employee with a known propensity to sexually harass and sexually groom young school students"; (4) "[f]ailing to properly identify and report unsafe, dangerous, deficient, and/or substandard practices"; and (5) "[f]ailing to provide reasonable and necessary measures and safeguards to prevent . . . sexual harassment and sexual battery." (Dkt. No. 1 at ¶ 67).

The District argues that the Complaint makes only conclusory allegations regarding how it was purportedly grossly negligent in its supervision, protection, control, confinement, or custody of Plaintiff. (Dkt. No. 9-1 at 11-12). In response, Plaintiff asserts that it has pled gross negligence in "concrete terms." (Dkt. No. 13 at 21-22). Namely, the Complaint alleges that the District ignored reports from other parents concerning Montgomery's misconduct towards Plaintiff and other students; the District knew of Montgomery's prior relationship with a student she previously taught and did not implement measures to prevent her from forming a similar relationship with Plaintiff; knew or should have known that Montgomery violated the District's policies by privately communicating with Plaintiff; allowing Montgomery to teach Plaintiff in a one-on-one class; and failing to "provide any meaningful intervention, investigation, supervision, or protective measure[s]." *Id*. at 21-22.

"The South Carolina Tort Claims Act addresses the circumstances under which a governmental entity is liable for tortious conduct of its employees." *Moore by Moore v. Berkeley Cnty. Sch. Dist.*, 486 S.E.2d 9, 13 (S.C. Ct. App. 1997). It specifically provides that liability does not extend to losses resulting from "employee conduct outside the scope of his official duties or which constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15-78-60(17). Moreover, a plaintiff may not seek recovery from a governmental entity for a loss resulting from "responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any student . . . of any governmental entity, except when the responsibility or duty is exercised in a grossly negligent manner." S.C. Code Ann. § 15-78-60(25). "Gross negligence means the failure to exercise a slight degree of care." *Moore*, 486 S.E.2d at 13. "Gross negligence involves an intentional, conscious failure to do something which it is incumbent upon one to do or the intentional doing of a thing one ought not to do." *Id*. "The

25

term is relative and means the absence of care that is necessary under the circumstances." *Id*. (citation omitted).

In South Carolina, an employer may be liable for negligent supervision when an employee intentionally harms another and (1) the employee is on the premises of the employer or using a chattel of the employer, (2) the employer knows or has reason to know of the ability to control the employee, and (3) the employer knows or should know of the necessity and opportunity for exercising control. *See Degenhart v. Knights of Columbus*, 420 S.E.2d 495, 496 (S.C. 1992) (citation omitted). Stated differently, "[i]n circumstances where an employer knew or should have known that its employment of a specific person created an undue risk of harm to the public, a plaintiff may claim that the employer was itself negligent in hiring, supervising, or training the employee . . . ." *James v. Kelly Trucking Co.*, 661 S.E.2d 329, 330 (S.C. 2008) (citation omitted). Here, the parties disagree as to the third element.

Before determining whether the District's conduct, as alleged, rises to the level of gross negligence, the Court finds it helpful to review three South Carolina cases addressing whether an employer was grossly negligent in failing to supervise, protect against, or control an employee who committed sexual abuse or harassment. *See Moore*, 486 S.E.2d at 13; *Doe by Doe v. Greenville Hosp. Sys.*, 448 S.E.2d 564 (S.C. Ct. App. 1994); *Brockington v. Pee Dee Mental Health Ctr.*, 433 S.E.2d 16 (S.C. Ct. App. 1993).

In *Brockington*, an employee at the defendants' mental health facility was a therapeutic assistant assigned to provide care to the plaintiff—a patient residing at the defendant's mental health facility. *Id*. at 17. The employee, who scored well on his evaluations, worked without supervision. *Id*. On several occasions, the employee sexually abused and harassed the plaintiff. *Id*. The plaintiff never informed the defendants about the employee's misconduct. *Id*. Months later,

26

the employee sexually assaulted another patient, and that patient's mother reported the assault, leading to the employee being criminally prosecuted. *Id*. The plaintiff thereafter filed suit against the facility, and the jury found in his favor on the issue of negligent supervision. *Id*. On appeal, the South Carolina Court of Appeals reversed the judgment, in part, because there was no evidence that the defendants had any prior knowledge of the employee's predatory behavior. *Id*. at 18. In particular, the court found that there was "nothing that the defendants gathered from [the employee], co-workers at the [facility], or elsewhere about either [the employee's] personal history or his work activities alerted the defendants that [he] would engage in predatory homosexual activity or other inappropriate sexual conduct with clients and with [the plaintiff] in particular." *Id*.

In *Greenville Hospital System*, a minor working as a candy striper in a hospital operated by the defendant alleged that an adult male employee sexually assaulted her while she was working at the hospital. 448 S.E.2d at 565. The court of appeals affirmed a finding of negligent hiring and supervision by the defendant because it had prior knowledge that the employee previously sexually assaulted another employee, a sixteen-year-old minor, on two separate occasions. *Id*. at 568. The court of appeals found that the defendant "was aware of the allegations of inappropriate behavior" by the male employee towards a minor and thus knew or should have known about the risk he posed to the plaintiff. *Id*.

Finally, in *Moore by Moore*, a middle school student was sexually assaulted by his summer-school teacher. 486 S.E.2d at 10. The plaintiff brought claims against the school district alleging that it was grossly negligent in hiring and supervising the teacher and supervising the minor as a student. *Id*. The minor testified that the teacher's classroom was not run in the normal fashion: "The students did not do any work in her class. They were rowdy and sat around talking.

The radio was often playing. [The teacher] permitted the students to smoke cigarettes in class and on one occasion [the plaintiff] observed her smoking marijuana with other students during a break." *Id.* at 11. The plaintiff further testified that [the school's principal] visited the classroom and witnessed how [the teacher] ran her classroom. *Id.* Other teachers observed "a male student massaging [the teacher's] shoulders, students sitting around chatting, students walking around, a male student answering the locked door to [the teacher's] classroom when the lights were off, and [the teacher] holding hands with a male student." *Id.* The other teachers, however, did not report what they saw to the school's administration. *Id.* During the school year, the teacher told the plaintiff that he would need to make up a missed day of class, and that she would tutor him in her home. *Id.* at 12. While at her house, "they smoked marijuana and engaged in sexual intercourse." *Id.* The plaintiff did not report the incident until after other students reported the teacher for sexual behavior. *Id.*

The court of appeals affirmed the lower court's grant of summary judgment, finding that "[t]here [was] no evidence . . . that the District had notice of improper sexual contact between [the teacher] and any other students prior to the incident involving [the plaintiff]." *Id.* at 13. The court found that no one "ever complained to the District . . . about [the teacher's] conduct during summer school or her tutoring in her home." *Id.* The court said that the evidence only showed that the teacher ran her classroom "in a lax manner." *Id.*

With these cases in mind, the Court finds that Plaintiff has sufficiently pled facts that would allow the Court to reasonably infer that the District had reason to know that Montgomery—prior to this incident—would engage in sexual activities with Plaintiff. Unlike in *Moore* and *Brockington*, where there were no prior reports of sexual misconduct that would have put the defendant on notice that the employee would engage in improper sexual behavior, the District

28

allegedly knew that Montgomery had a sexual relationship with a former student and received reports that Montgomery was sexually grooming Plaintiff and other students at Hilton Head prior to learning she had sexual intercourse with Plaintiff. Moreover, like in *Greenville Hospital System*, where the supervisors learned of allegations of sexual assault from other sources, Plaintiff alleges that the District discovered Montgomery's inappropriate behavior through multiple reports provided by parents of other students. Therefore, because there are factual allegations that would indicate that the District was on notice of Montgomery's inappropriate sexual proclivities, Plaintiff states a claim that the District knew or should have known of the necessity of supervising, protecting against, or controlling Montgomery's conduct in the classroom.

### D. Intentional Infliction of Emotional Distress ("IIED") and Outrage

Plaintiff concedes that he cannot state a claim for IIED or outrage against the District because the South Carolina Tort Claims Act bars suits against school districts for such claims. (Dkt. No. 13 at 20-21). *See* S.C. Code Ann. § 15-78-30(f), (h); 15-78-60(17); *Smith v. City of Charleston*, No. 2:06-CV-00825-DCN, 2007 WL 9735801, at *5 (D.S.C. July 24, 2007) ("Recovery from governmental entities for intentional torts and intentional infliction of emotional distress is specifically barred by the [South Carolina] Tort Claims Act."). *See also Alonso v. McAllister Towing of Charleston, Inc.*, 595 F. Supp. 2d 645, 649 (D.S.C. 2009) (noting that "outrage" is equivalent to IIED). Accordingly, Plaintiff's claims of IIED and outrage against the District are dismissed.

### E. Negligence per se

The Complaint alleges that the District committed negligence per se because its conduct in this case violated "the Safe Schools Act of 1990, S.C. Code [Ann.] § 59-5-10 et seq." (Dkt. No. 1 ¶ 71). As Plaintiff now acknowledges, this is a citation error. (Dkt. No. 13 at 22). The Safe Schools

Act is found in S.C. Code Ann. § 59-63-110, *et seq.*, not the statute cited in the Complaint. Plaintiff additionally recognizes that the South Carolina Supreme Court has held that there is no private right of action under the Safe Schools Act. (Dkt. No. 13 at 22). *See K.S. ex rel. Seeger v. Richland Sch. Dist. Two*, 912 S.E.2d 240, 248 (S.C. 2025). Accordingly, Plaintiff seeks leave to amend the Complaint to allege negligence per se based on S.C. Code Ann. § 16-3-755, which criminalizes sexual battery by a school employee against a student. (Dkt. No. 13 at 22-23). He claims that the statute was "enacted to protect students from a particular kind of harm—sexual exploitation of children—and Plaintiff falls squarely within the class of persons the statute is designed to protect." *Id*. at 23. The District argues that any amendment would be futile because S.C. Code Ann. § 16-3-755 is applicable only to persons like Montgomery, not governmental entities, which may not be criminally charged and held vicariously liable for Montgomery's conduct. (Dkt. No. 14 at 6). Moreover, it argues that Plaintiff "has already pleaded gross negligence under the South Carolina Tort Claims Act . . . , making any . . . revision . . . redundant." *Id*.

Rule 15(a)(1) of the Federal Rules of Civil Procedure allows a party to amend its pleading once as a matter of course. Thereafter, the party may only amend with the opposing party's written consent or the court's leave, which should be granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Supreme Court discussed how courts should apply this standard in *Foman v. Davis*, stating:

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

30

371 U.S. 178, 182 (1962).

The Court finds that Plaintiff's proposed amendment would be futile because he cannot state a plausible negligence per se claim based on S.C. Code Ann. § 16-3-755 against the District.

To show that a defendant owes a duty of care arising from a statute, "the plaintiff must show two things: (1) that the essential purpose of the statute is to protect from the kind of harm the plaintiff has suffered; and (2) that he is a member of the class of persons the statute is intended to protect." *Rayfield v. S.C. Dep't of Corr.*, 374 S.E.2d 910, 914 (S.C. Ct. App. 1988). Making these showings proves "the first element of a claim for negligence: viz., that the defendant owes him a duty of care." *Id*. at 915. "If [the plaintiff] then shows that the defendant violated the statute, he has proven the second element of a negligence cause of action: viz., that the defendant, by act or omission, failed to exercise due care. This constitutes proof of negligence *per se*." *Id*.

Here, Plaintiff seeks leave to amend the Complaint to assert a negligence per se claim based on S.C. Code Ann. § 16-3-755. That criminal statute prohibits certain *individuals* affiliated with a public or private secondary school from committing sexual battery, including sexual intercourse, with a student enrolled at the school. S.C. Code Ann. § 16-3-755. The statute defines a "person affiliated with a public or private secondary school" as an "administrator, teacher, substitute teacher, teacher's assistant, student teacher, law enforcement officer, school bus driver, guidance counselor, or coach who is affiliated with a public or private secondary school but is not a student enrolled in the school." S.C. Code Ann. § 16-3-755(A)(3).

Even assuming Plaintiff could satisfy the first element of a negligence per se claim, the amendment would be futile because the statute imposes duties only on the individuals identified therein; it does not apply to school districts or other governmental entities. In other words, Plaintiff cannot establish negligence per se against the District because the District is not a "person affiliated

31

with a public or private secondary school" and therefore cannot violate § 16-3-755. Moreover, as the District correctly notes, governmental entities are not liable under the South Carolina Tort Claims Act for losses resulting from employee conduct outside the scope of official duties or conduct constituting "actual fraud, actual malice, intent to harm, or a crime involving moral turpitude." S.C. Code Ann. § 15-78-60(17). Montgomery's conduct undoubtedly fits within this exception. Thus, Plaintiff cannot state a plausible negligence per se claim against the District based on § 16-3-755, and amendment would be futile. The Court therefore denies Plaintiff's request for leave to amend and dismisses the negligence per se cause of action.

## IV.    Conclusion

For the foregoing reasons, the District's motion to dismiss (Dkt. No. 9) is **GRANTED IN PART** and **DENIED IN PART**. Plaintiff's Title IX discrimination claim and gross negligence claim against the District remain pending. All claims asserted against Montgomery remain pending, as no claims against her are dismissed.

**AND IT IS SO ORDERED.**

s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

June 16, 2026
Charleston, South Carolina